# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THOMAS WAYNE CUNNINGHAM,

      Plaintiff,

v.                                                    CV 13-0142 JAP/WPL

STATE OF NEW MEXICO,
SECOND JUDICIAL DISTRICT ATTORNEY
(SHANNON MURDOCK MILES),
THE CITY OF ALBUQUERQUE, NEW MEXICO,
ALBUQUERQUE POLICE OFFICER, PETER HACKETT,
DUFF RYAN, CHIEF RAY SCHULTZ,

      Defendants,

                                consolidated with

THOMAS WAYNE CUNNINGHAM,

      Plaintiff,

v.                                                    CV 13-0314 JAP/WPL

STATE OF NEW MEXICO,
SECOND JUDICIAL DISTRICT ATTORNEY
(SHANNON MURDOCK MILES),
THE CITY OF ALBUQUERQUE, NEW MEXICO,
POLICE OFFICERS PETER HACKETT & DUFF RYAN,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

The case at hand stems from a traffic stop, an arrest, and a vehicle search in 2005. After

subsequently pleading guilty to a trafficking charge in state court, the arrestee, Thomas Wayne

Cunningham, continued to fight until he ultimately succeeded in having the charge dismissed.

Now he seeks civil damages against the City of Albuquerque ("the City") and his arresting

officers, Peter Hackett and Duff Ryan, asserting a variety of state and federal claims. In turn, Defendants seek summary judgment in their favor, asserting qualified immunity as to the federal claims and insisting that they are entitled to judgment as a matter of law on all other claims.

As in the film *Rashomon*, the parties' descriptions of the events at issue here vary dramatically and are often difficult to reconcile. Nonetheless, having considered the parties' submissions and the relevant law, and having resolved all factual inconsistencies in Cunningham's favor for present purposes, I conclude that qualified immunity should protect Defendants from Cunningham's federal claims and that there is no genuine dispute of material fact as to the remaining claims. Therefore, I recommend that the Court grant Defendants summary judgment on all claims.

## FACTUAL BACKGROUND

Unless otherwise indicated, the facts described herein are not in dispute. On December 14, 2005, Hackett and Ryan were patrolling near the 13000 block of Central Avenue in Albuquerque, New Mexico, which they knew to be an area where drug trafficking frequently takes place. According to Hackett and Ryan, they noticed a brown Oldsmobile sedan parked in the lot of the hotel where, as it turns out, Cunningham was staying. The sedan, which belonged to a friend who was visiting Cunningham, had a New Mexico license plate displayed in the rear window rather than affixed to the rear bumper of the car. Defendants state that the license plate was impossible to fully read given its position, though Cunningham disputes this.

As Cunningham and his friend left his hotel room and headed toward the friend's car, which was parked next to his own, he saw two police cars race across the parking lot in their direction, pass them, and then stop and watch them in their rear-view mirrors. Defendants state that the two men turned around and returned to Cunningham's hotel room once they saw the

officers. The officers then spoke to the hotel manager, who gave Cunningham's name as the occupant of the hotel room for the past five days and who stated without further elaboration that something "dubious" was taking place in that room. Hackett and Ryan returned to their vehicles and took up a position of surveillance across the street, then began investigating Cunningham and learned that he was on probation. The officers state that they then spoke to his probation officer and were told that Cunningham would be violating his probation if he had stayed in a hotel room for the past five days.

By contrast, Cunningham states that he and his friend continued to their vehicles after seeing the police cars. After Cunningham retrieved a cigarette pack from his car, he noticed that the police had left. He then got into his friend's sedan and drove to the friend's house a few blocks away. After a short time, Cunningham alone drove his friend's sedan back to the hotel, visited his room briefly, and then returned to the car with the intention of going to the store.

Neither party disputes that as Cunningham was driving away from the hotel parking lot, Hackett and Ryan activated their emergency lights and sirens and pulled Cunningham over into another hotel parking lot. Defendants state, and Cunningham does not deny, that as they approached the sedan, Hackett and Ryan saw Cunningham moving within as if he was trying to conceal or retrieve something under the front seat. Defendants claim that this movement raised concerns that Cunningham might be trying to grab a weapon. The officers approached the sedan—with guns drawn, according to Cunningham—and Ryan ordered Cunningham to exit.

Cunningham got out of the sedan and moved to the rear of the vehicle, where he answered the officers' questions regarding his name, where he was coming from, and the car owner's name. Cunningham claims that he told the officers that the sedan's proof of insurance was over the sun visor, but that the officers then arrested him for allegedly violating his

probation. After that, according to Cunningham, Hackett searched the sedan and found a bag of crack cocaine.

As Defendants describe the encounter, Cunningham provided a letter from the New Mexico Motor Vehicles Division ("MVD") stating that the sedan was not currently insured. Believing the sedan to be uninsured, and believing that a City of Albuquerque ordinance called for the towing of vehicles in these circumstances, Hackett called for a wrecker to tow the sedan. The officers then conducted a vehicle inventory, at which time they discovered a bag containing small rocks resembling crack cocaine. Hackett then conducted a field test, which was positive for cocaine. Although none of Defendants' supporting affidavits describe exactly when they arrested Cunningham during this encounter, their *Martinez* report indicates that the arrest occurred after they discovered the crack cocaine.[1]

Cunningham claims that after he was taken to a police substation, Ryan issued him warnings for displaying the sedan's license plate in the rear window and for driving an uninsured vehicle. Cunningham states that Ryan "had [him]" sign the warning tickets and that he was then transferred to the Metropolitan Detention Center.

Cunningham was arraigned in January 2006 and charged with one count of trafficking of a controlled substance with intent to distribute. His motion to suppress the evidence against him failed, after which time he agreed to a consolidated plea that would allow him to appeal the denial of his suppression motion. On appeal, the New Mexico Court of Appeals observed that the State had presented no evidence that Cunningham had admitted that the sedan was uninsured or that Defendants had acquired any documentation or other information showing that the sedan

---

[1] "Once Mr. Cunningham was unable to provide proof of insurance, the officers had probable cause to arrest him. Since the vehicle was being towed, the officers lawfully conducted a[n] inventory search. Once the officers discovered the crack cocaine, there was further probable cause to arrest and charge [Cunningham] . . . ." (Doc. 43 at 18 (internal citations omitted).)

was uninsured. *See State v. Cunningham*, No. 27,884, 2010 WL 4685395, at *3 (N.M. Ct. App. Aug. 2, 2010) (unpublished). The court thus concluded that Hackett and Ryan did not have authority to impound the sedan Cunningham had been driving, and therefore they did not have the authority to conduct an inventory search prior to having the sedan towed. *Id.* at *4. The appellate court reversed the district court's denial of Cunningham's motion to suppress and remanded the case for further proceedings. *Id.* at *5. On June 13, 2011, the district court dismissed this trafficking charge. (Doc. 43 Ex. O at 5.)[2]

## PROCEDURAL BACKGROUND

Cunningham filed a lawsuit against Hackett, Ryan, and other defendants in 2007, centering in part on the events at issue here. *See Cunningham v. Albuquerque Police Dep't*, No. 07-cv-0411 RB/RHS, Doc. 1 (D.N.M. Apr. 26, 2007) (unpublished). My previous Proposed Findings and Recommended Disposition (Doc. 31) addresses that action in more detail; here, it is enough to note that the lawsuit was dismissed without prejudice in September 2010.

Cunningham filed a complaint against the City, Hackett, Ryan, and other Defendants in state court in July 2012, and he filed a second complaint in this Court against the same Defendants and the Albuquerque Chief of Police in February 2013. The state court complaint was later removed to this Court and consolidated into the instant action. In these complaints, Cunningham originally brought claims of racial profiling, illegal search and seizure, malicious prosecution, false imprisonment, and conspiracy pursuant to 42 U.S.C. § 1983, claims of malicious abuse of process and conspiracy under state law, and numerous other claims.

---

[2] The dismissal appears in an Amended Judgment, Sentence, and Fully Suspended Sentence that covers both the criminal case in question, D-202-CR-200600007, and a consolidated criminal case addressing another offense, D-202-CR-200603903. Although the sentence for Cunningham's conviction in the latter case was simply suspended in full, the document reflects that D-202-CR-200600007 was dismissed "in its entirety." (Doc. 43 Ex. O at 5.) The dismissal is also reflected on the docket for this criminal case. (*See* Doc. 43 Ex. P at 9.)

Pursuant to 28 U.S.C. § 1915(e)(2) and Federal Rule of Civil Procedure 12(b)(6), the Court dismissed several of Cunningham's claims and all Defendants except for the City, Hackett, and Ryan before allowing service of process on the latter three parties. (Doc. 14.) Later, pursuant to numerous dispositive motions filed by Defendants, and on my recommendation, the Court dismissed all remaining claims other than those named in the preceding paragraph. (Doc. 36.)

I subsequently ordered Defendants to submit a *Martinez* report responding to Cunningham's remaining claims and providing all relevant information. In that Order, I informed the parties that the information presented in the *Martinez* report and any responses thereto could be used in determining whether to award summary judgment to either party. Defendants filed their *Martinez* report in February 2014, arguing that they are entitled to qualified immunity as to Cunningham's § 1983 claims and that his state law claims must fail in the absence of any constitutional violation. (Doc. 43.) Cunningham responded by disputing Defendants' factual and legal assertions, and he appears to request that the Court construe his response as a motion for summary judgment in his favor. (Doc. 45.) Although Cunningham's response itself is not sworn under penalty of perjury, he also submitted a sworn affidavit in which he generally and briefly recounts the factual allegations from his complaints. (Doc. 46.)[3] Defendants filed a reply brief challenging the sufficiency of Cunningham's affidavit and asserting that Cunningham had failed to rebut their arguments. (Doc. 47.)

---

[3] Though Defendants' reply brief challenges the validity of Cunningham's affidavit in that it "purports to be notarized but bears no notary seal," Cunningham does sign and date his affidavit and says that he "swear[s] under penalty of perjury that the information in this affidavit is true and correct to the best of my knowledge." As such, Cunningham's filing is construed as a properly sworn affidavit "with like force and effect." *See* 28 U.S.C. § 1746(2).

**LEGAL STANDARDS**

I.      **Summary Judgment**

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit, and the dispute is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). In ruling on a summary judgment motion, the Court may neither make credibility determinations nor weigh the evidence. *Gossett v. Oklahoma*, 245 F.3d 1172, 1175 (10th Cir. 2001) (quotation marks omitted).

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citation omitted). A *Martinez* report is also treated as an affidavit, and this report can be used in determining whether to grant summary judgment if it is "supported by affidavits or other materials provided under oath." *Id.* at 1110, 1111 (citations omitted). A court cannot resolve material disputed factual issues by accepting a *Martinez* report's findings when the plaintiff has presented conflicting evidence. *Id.* at 1111. However, conclusory allegations without specific supporting facts have no probative value and cannot create a genuine issue of fact. *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992). As is true with all affidavits, statements of mere

belief must be disregarded. *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

As with all pleadings filed by pro se individuals, the Court must liberally construe the allegations contained in Cunningham's complaints. *Northington v. Jackson*, 973 F.2d 1518, 1520-21 (10th Cir. 1992) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). However, the Court must apply the same legal standards applicable to pleadings drafted by counsel. *Id.*

## II.    Qualified Immunity

Additional steps are taken when a summary judgment motion raises a defense of qualified immunity. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* The court may consider either of these prongs before the other "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Rojas v. Anderson*, 772 F.3d 1000, 1003 (10th Cir. 2013) (internal quotation marks omitted).

The "clearly established" inquiry exists in part to protect officers who were mistaken as to what the law required at the time of the alleged constitutional violation, but whose mistake of law was reasonable. *See Saucier v. Katz*, 533 U.S. 194, 205 (2001). Because the doctrine is intended to protect "all but the plainly incompetent or those who knowingly violate the law," summary judgment on the basis of qualified immunity is appropriate "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful." *Id.* at 202 (quoting *Malley v.*

*Briggs*, 475 U.S. 335, 341 (1986)). Thus, the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. A right is only considered to be clearly established when there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quotation omitted).

At the summary judgment stage, a court generally must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *id.*, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," *id.* at 380. "However, because at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citation omitted). "In short, although [courts] will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

### DISCUSSION

Cunningham brings five federal claims pursuant to 42 U.S.C. § 1983,[4] which I reorganize as follows: (I) illegal search and seizure; (II) malicious prosecution; (III) false imprisonment; (IV) racial profiling; and (V) conspiracy. After addressing these claims, as applied to both the

---

[4] When a person acting "under color of state law" deprives a citizen of any "rights, privileges, or immunities secured by the Constitution and laws[,]" 42 U.S.C. § 1983 provides a remedy. *Monroe v. Pape*, 365 U.S. 167, 172, 184-87 (1961).

individual Defendants and the City, I will consider Cunningham's claims of malicious abuse of process and conspiracy under state law.

### I.      Illegal Search and Seizure

The Fourth Amendment protects citizens from "unreasonable searches and seizures" by government officials. U.S. CONST. amend IV; *see, e.g.*, *United States v. Burleson*, 657 F.3d 1040, 1044-45 (10th Cir. 2011). A "routine traffic stop" such as the one at issue here constitutes an investigative detention and is therefore governed by the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008) (citations omitted). Such a seizure must therefore be reasonable—that is, it must be justified by a reasonable articulable suspicion that the person seized had committed or was about to commit a crime. *See, e.g.*, *United States v. De La Cruz*, 703 F.3d 1193, 1196 (10th Cir. 2013). Reasonable suspicion is "something more than an inchoate and unparticularized suspicion or hunch," but it "is considerably less than proof by a preponderance of the evidence or that required for probable cause." *United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011) (citation omitted). Reasonable suspicion is measured by the totality of the circumstances, using an objective standard; the detaining officer's subjective beliefs and intentions are irrelevant. *See id.* at 1221-22 (citation omitted).

The reasonableness of an investigative stop is examined under a two-step inquiry. *Lundstrom v. Romero*, 616 F.3d 1108, 1120 (10th Cir. 2010). First, a court must assess whether the detention was justified at its inception. *Id.* (citation omitted). Second, the court must evaluate whether the officer's actions were reasonably related in scope to the circumstances that justified the detention. *Id.* at 1120 (citation omitted).

An arrest, on the other hand, must be supported by probable cause. U.S. CONST. amend IV. "Probable cause is measured against an objective standard"; the fulcrum issue is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *United States v. Soto*, 375 F.3d 1219, 1222 (10th Cir. 2004) (citation omitted). A court will find that probable cause supported a defendant's arrest when the reasonably trustworthy facts and circumstances known to the officer would cause a reasonable man to believe that the defendant has committed or is committing an offense. *See United States v. Morgan*, 936 F.2d 1561, 1568 (10th Cir. 1991) (citations omitted).

Finally, the Fourth Amendment protects against "unreasonable" searches. U.S. CONST. amend. IV; *see also Terry*, 392 U.S. at 19 (defining "the central inquiry under the Fourth Amendment" as "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security"). "[S]ubject only to a few specifically and well-delineated exceptions," searches conducted without a warrant "are per se unreasonable under the Fourth Amendment." *Katz v. United States*, 389 U.S. 347, 357 (1967).

A. <u>The Initial Stop</u>

Defendants assert that the officers' initial stop of Cunningham was premised on a suspected violation of N.M. STAT. ANN. § 66-3-18(A), which governs the display of vehicle registration plates. In pertinent part, the statute reads, "The registration plate shall be attached to the rear of the vehicle for which it is issued . . . . It shall be in a place and position so as to be clearly visible, and it shall be maintained . . . in a condition to be clearly legible." N.M. STAT. ANN. § 66-3-18(A).

The parties agree that the registration plate for the sedan that Cunningham was driving was displayed in the rear window of that vehicle. Defendants argue that the plate was both

illegally displayed and illegible, thereby warranting the traffic stop. For support, they provide documents including Hackett's criminal complaint against Cunningham, which stated under penalty of perjury that "it was impossible to fully read the plate because of the way it was positioned" (Doc. 43 Ex. D at 1), and affidavits from Hackett and Ryan stating without elaboration that the sedan had "illegible / illegally displayed license plates" (*e.g.*, Doc. 43 Ex. E at 2).

In his response, Cunningham states that the registration plate was "clearly legible" in the rear window of the sedan. Though Cunningham's response brief is unsworn, a reasonable inference in his favor as to the legibility of the plate may be drawn from his sworn affidavit, which insists that the plate "was in the back window firmly positioned between the glass and the rubber gasket around the glass." Cunningham's assertion that the plate was legible is not "so utterly discredited by the record that no reasonable jury could . . . believe[] him," *cf. Scott*, 550 U.S. at 380, and the reconciling of the parties' inconsistent statements "is solely within the province of the [trial factfinder]," *see Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1297 (10th Cir. 2001). As such, and given the Court's obligation to construe the facts in the light most favorable to Cunningham, I will assume for now that the registration plate was displayed in a legible manner in the sedan's rear windshield.

If the registration plate was legible, and in the absence of any allegation that the plate was not kept in a legible condition, then the officers' traffic stop could only have been justified on a reasonable suspicion that the plate was improperly attached to the rear of the sedan. *See* N.M. STAT. ANN. § 66-3-18(A). Defendants assert in their reply brief that the language of that provision, providing that the plate "shall be attached to the rear of the vehicle," necessarily refers to the rear bumper of the vehicle. Cunningham insists that "[t]here was nothing wrong with the

tag" and "no evidence of a traffic violation," which I liberally construe as an argument that the plate was placed in compliance with the statute.

The Tenth Circuit has come close to considering whether "attached to the rear" means "attached to the bumper," though it ultimately found no need to reach the question. *See United States v. Hanrahan*, 508 F.3d 962, 966-67 (10th Cir. 2007) (recognizing the criminal defendant's argument that a registration plate in the rear window satisfies § 66-3-18(A) but finding the traffic stop to be justified on other grounds); *see also United States v. Lucas*, 322 F. App'x 326, 327-28 (4th Cir. 2009) (unpublished) (reviewing a lower-court decision finding that a plate in the rear window "could arguably constitute compliance with" a similarly worded provision, and recognizing a state-court decision that undercut this argument, but ultimately finding a traffic stop to be justified on other grounds). However, the District of Columbia Circuit found that where state law required that a plate be "attached on the front," the officers' decision to stop a driver whose plate was placed on the dashboard was objectively reasonable and therefore lawful, "even assuming they were mistaken that the law required display . . . on the bumper." *United States v. Southerland*, 486 F.3d 1355, 1358-59 (D.C. Cir. 2007) (citing MD. CODE ANN., TRANSP. § 13-411(a), (c)).

I agree with and adopt the court's reasoning in *Southerland*, and therefore I conclude that Hackett and Ryan's decision to stop Cunningham for the placement of his registration plate was objectively reasonable. Further, as explained in the preceding paragraph, there is no Tenth Circuit or Supreme Court decision standing for the proposition that it is objectively unreasonable to initiate a traffic stop when a vehicle's registration plate is in the rear window and statutory language requires the plate to be "attached to the rear" of the car. Nor does the clearly established weight of authority from other circuits hold that this is the case. In other words,

Cunningham has failed to show that Hackett and Ryan violated a clearly established constitutional right when stopping him, and thus Hackett and Ryan are entitled to qualified immunity on that question.

The analysis does not end with the justification for the stop, however, as a *Terry*-like seizure under the Fourth Amendment must be conducted reasonably as well. *See Terry*, 392 U.S. at 27-28. Even assuming that they lacked probable cause to arrest him, Hackett and Ryan's seizure of Cunningham remained valid "unless the amount of force used transformed the interaction into a de facto arrest." *See United States v. Mosley*, 743 F.3d 1317, 1328 (10th Cir. 2014). Given a liberal construction, Cunningham's complaints may be read to allege that the officers' seizure transformed into an illegal arrest when Hackett and Ryan ordered him out of the vehicle "at gunpoint." (*See* Doc. 1 at 5.)

Police officers may, "as a matter of course[,] order the driver of a lawfully stopped car to exit his vehicle." *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977)). "[O]fficers may [also] use force during a *Terry*-type detention to the extent that such steps are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Mosley*, 743 F.3d at 1328-29 (quoting *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007)) (internal quotation marks omitted). "Under certain circumstances, the steps officers may permissibly take to protect their safety include drawing their weapons, placing a suspect in handcuffs, or forcing a suspect to the ground." *Id.* at 1329 (quoting *Novitsky*, 491 F.3d at 1254). "Although effectuating a *Terry* stop by pointing guns at a suspect may elevate a seizure to an 'arrest' in most scenarios, the use of guns in connection with a [*Terry*] stop is permissible where the police reasonably believe they are necessary for their protection." *Id.* (internal citations and quotation marks omitted); *see also*

*United States v. Merkley*, 988 F.2d 1062, 1064 (10th Cir. 1993) (noting that the display of firearms may be part of a reasonable *Terry* stop in certain circumstances). Further, if an officer effecting a *Terry* stop has reason to believe that a vehicle occupant is armed and dangerous, "the officer[] may reasonably order the occupants out of the vehicle 'as a means of neutralizing the potential danger' without elevating the stop to the level of an arrest." *Mosley*, 743 F.3d at 1330 (citing *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

In *Perdue*, the Tenth Circuit held that officers were justified in effecting a *Terry* stop with weapons drawn simply because the car was stopped on property where marijuana was being cultivated and where firearms were known to be found, even though they were unsure whether the driver was armed. *See* 8 F.3d at 1462-63. Relying on *Perdue*, the Tenth Circuit in *Mosley* found that an investigatory stop was conducted reasonably where the officers drew their weapons and ordered the defendant out of his vehicle, given that the stop happened at 3:00 a.m. in a high-crime area after receiving a tip that the defendant had a gun in his lap and after observing his furtive movements in the vehicle. *Mosley*, 743 F.3d at 1330.

Although the facts here are not completely analogous to those in *Perdue* and *Mosley*, I find that these circumstances similarly support a finding that Cunningham's seizure was conducted reasonably. Hackett and Ryan both stated in sworn affidavits that as they approached the sedan, they observed Cunningham "attempting to conceal or remove an unknown item(s) from the front seat / console area," and they became concerned for their safety. Cunningham does not dispute any of this in his filings. Moreover, the officers were aware that drug trafficking frequently took place in that area. That information, taken together with Cunningham's furtive movements, renders Hackett and Ryan's precautionary measures—ordering Cunningham out of the vehicle with weapons drawn—reasonable under the circumstances. Finally, the Tenth Circuit

caselaw cited here establishes that even if Cunningham's traffic stop was conducted unreasonably, it was not clearly established that this was the case.

Cunningham has failed to show that Hackett and Ryan violated his clearly established constitutional rights when instigating and conducting the investigatory traffic stop at issue here. Accordingly, Hackett and Ryan are entitled to qualified immunity with respect to the initial traffic stop.

B.  <u>Cunningham's Arrest</u>

As with the initial stop, Cunningham and Defendants paint two different pictures of his arrest. Defendants state that after Cunningham produced a letter from the MVD stating that the sedan he was driving was uninsured, they ordered that the vehicle be towed, conducted an inventory search, and then arrested Cunningham after finding a bag of crack cocaine. However, Cunningham alleges that he was arrested almost immediately after telling Hackett and Ryan that the vehicle's insurance information was above the sun visor, without any effort by the officers to retrieve this insurance information or to otherwise confirm or deny the insured status of the vehicle. In the absence of any evidence—such as dashboard camera video or a copy of the MVD letter in question—that might "utterly discredit[]" Cunningham's version of the facts, I must adopt those facts for purposes of this motion and analyze Cunningham's Fourth Amendment claim in their light. *See Scott*, 550 U.S. at 378, 380.

Even under Cunningham's version of the facts, Defendants argue that his arrest was supported by probable cause to believe that the state's traffic code had been violated. They contend that N.M. STAT. ANN. § 66-8-123 provides a police officer with the authority to initiate a custodial arrest of any person who commits even a minor violation of a traffic law, such as Cunningham's operation of his friend's sedan with the registration plate in the rear window. In

the alternative, Defendants insist that such a custodial arrest was permitted under the Fourth Amendment, regardless of whether the arrest was authorized by state statute, since the officers possessed probable cause to believe that the registration statute had been violated.

It is difficult to credit Defendants' statutory argument. Although § 66-8-123 refers to the "arrest" of those who violate the state's traffic code, the procedure it authorizes generally requires the mere issuance of a citation and, if the "arrested person" signs the citation, his release from custody. Despite the use of the term "arrest," courts have recognized that this procedure is "more in the nature of an investigative detention." *United States v. Gonzalez*, 763 F.2d 1127, 1130 n.1 (10th Cir. 1985); *see also United States v. Landell*, No. CR 07-63 MCA, 2007 WL 2712962, at *11 (D.N.M. June 22, 2007) (unpublished) (citing *State v. Bricker*, 134 P.3d 800, 805-06 (N.M. Ct. App. 2006)) (noting that New Mexico courts interpret the state's constitution as requiring the "cite-and-release" procedure of § 66-8-123 in the absence of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the additional] intrusion of a full custodial arrest"). Defendants' broad reading of the statute is also inconsistent with the Albuquerque Police Department's own policies, which restrict its officers' authority to physically arrest violators for traffic violations to a select number of circumstances, none of which applied in Cunningham's case. (*See* Doc. 43 Ex. R at 1-2.) The argument that § 66-8-123 authorized the custodial arrest of Cunningham for a purported violation of the state's law on registration plate placement flies in the face of the statute's structure, that provision's interpretation by state and federal courts, and the police department's own policies.

For purposes of federal law, however, the officers' options were not governed by that statute alone. The Fourth Amendment permits an arrest "if an officer has probable cause to

believe that an individual has committed even a very minor criminal offense in his presence." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *see also Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 n.2 (10th Cir. 2006). This is true even if such an arrest would be impermissible under state law. *See United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999).

With that framework in mind, I conclude that Cunningham has failed to show that Hackett and Ryan violated a clearly established constitutional right when they arrested him. Having observed Cunningham driving his friend's sedan, the officers certainly had probable cause to believe that Cunningham was operating a vehicle that did not have its registration plate attached to the rear bumper. I need not determine whether the placement of the registration plate in the rear window rather than on the rear bumper constituted a violation of § 66-3-18(A); it is enough to note that even if this was not the case, the officers' mistake of law was objectively reasonable. *See Southerland*, 486 F.3d at 1358-59 (citation omitted); *see also Saucier*, 533 U.S. at 205. Further, Cunningham has cited no Tenth Circuit or Supreme Court cases showing the law to be otherwise, and he has not shown that the clear weight of authority from other circuits supports a contrary view of the law. At the worst, then, the officers mistakenly but reasonably had probable cause to believe that a crime had been committed. As such, Hackett and Ryan are entitled to qualified immunity with respect to their arrest of Cunningham.

C. Search of the Sedan

As noted earlier, Cunningham states that he was arrested immediately after telling Hackett and Ryan that the insurance information for the sedan he was driving was above the sun visor, with no intervening effort by the officers to retrieve that information or to otherwise inquire into the vehicle's insured status. According to Cunningham, Hackett searched the

passenger compartment of the sedan contemporaneously with Cunningham's arrest and thereafter discovered a bag of crack cocaine. Cunningham asserts that this course of conduct violated the Fourth Amendment's protection against unreasonable searches.

As with the traffic stop and the arrest, Defendants contend that they are entitled to qualified immunity with respect to the vehicle search. However, Defendants' argument for qualified immunity is premised on an entirely different set of facts than those alleged by Cunningham. As Defendants describe the encounter, after the officers ordered Cunningham out of the sedan, he "produced" a form letter from MVD stating that his friend's sedan was uninsured.[5] Hackett and Ryan then decided to order that the sedan be impounded since Cunningham could not drive an uninsured vehicle, and a subsequent inventory search revealed the crack cocaine. Defendants assert that this inventory search was permissibly conducted pursuant to a lawful impoundment of the sedan.[6]

Defendants' inventory-search theory is problematic for them since it relies on alleged facts that are completely irreconcilable with Cunningham's factual assertions. Although Defendants argue that the vehicle was lawfully impounded since it was uninsured, there is no way to conclude from Cunningham's sworn allegations that the officers could have been aware

---

[5] Defendants do not explain in any further detail how Cunningham "produced" this letter. Since by all accounts Cunningham was not in the sedan when he was questioned, the implication is that Cunningham was somehow carrying on his person a MVD letter describing the insurance status of another person's vehicle.

[6] Inventory searches are "a well-defined exception to the warrant requirement of the Fourth Amendment" designed to protect the owner's property against theft, to protect the police against claims of loss or theft, and to protect the police from danger. *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997) (citing, *e.g.*, *Colorado v. Bertine*, 479 U.S. 367, 371 (1987)). Such searches "must not be a ruse for general rummaging in order to discover incriminating evidence, but rather an administrative procedure designed to produce an inventory." *Id.* at 772-73 (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)). Accordingly, inventory searches of vehicles will be considered reasonable only if the vehicle is lawfully taken into police custody and only if conducted according to standardized procedures. *See South Dakota v. Opperman*, 428 U.S. 364, 372-73 (1976); *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (citations omitted).

of the sedan's insurance status prior to the search. And at the summary judgment stage, I must accept Cunningham's version of events as true, *see Scott*, 550 U.S. at 378, particularly in light of the fact that the competing narratives here are drawn from nothing but conflicting self-serving affidavits, *see Hall*, 935 F.2d at 1111. It is a "fundamental principal" of summary judgment that the Court must not credit the movants' evidence over that of the non-movant at this stage of proceedings, and to ask that the Court do otherwise, without more, would demonstrate "a clear misapprehension of summary judgment standards." *See Tolan v. Cotton*, No. 13-551, 572 U.S. ---, 2014 WL 1757856, at *6-7 (2014) (per curiam). Since Defendants' inventory-search argument is premised on an inoperative set of facts, it is essentially useless; Defendants have utterly failed to argue for qualified immunity based on Cunningham's factual assertions.

Yet, because Defendants have asserted qualified immunity in this case, the burden now shifts to Cunningham to show that they violated a clearly established constitutional right. This he has not done, for even under the facts alleged, the search of the sedan Cunningham was driving was permissible on its face as a search incident to his arrest.

The search-incident rule is a well-established exception to the warrant requirement of the Fourth Amendment. *See Chimel v. California*, 395 U.S. 752, 755-64 (1969) (discussing the history of the search-incident rule since 1914). As the Supreme Court explained in *Chimel*, the "[s]earch of an arrested man and of the items within his immediate reach must in almost every case be reasonable" in order to prevent escape, to prevent attacks on police, and to prevent the destruction of evidence. *See id.* at 753.

For several decades, the application of this principle to the search of a vehicle operated or occupied by an arrestee was governed by the Supreme Court's decision in *New York v. Belton*, which concluded that *Chimel*'s area of "immediate reach" would "generally, even if not

inevitably," cover the entire passenger compartment of a vehicle. *See* 453 U.S. 454, 460 (1981). As a categorical rule, then, the Court concluded that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* In the Tenth Circuit, this rule applied "without regard to the fact that the search occurred after [the] [d]efendant had been restrained." *United States v. Brothers*, 438 F.3d 1068, 1073 (10th Cir. 2006) (citations omitted). The Supreme Court touted this rule as "[a] single, familiar standard . . . essential to guid[ing] police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Belton*, 453 U.S. at 458 (citation omitted).

Notably, the Supreme Court scaled back this categorical rule in 2009, holding that police may search a vehicle's passenger compartment incident to a recent occupant's arrest only when (1) "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," or (2) "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Arizona v. Gant*, 556 U.S. 332, 343 (2009). As the Court now recognizes, this more limited reading of the search-incident rule is more compatible with the purposes enunciated in *Chimel*—to prevent escape, danger to the arresting officer, or destruction of evidence—while still providing police with some leeway in relatively narrower circumstances. *See id.* at 339, 343-44.

If Cunningham had been arrested after April 21, 2009—the date that the Supreme Court decided *Gant*—then it would have been clear to Hackett and Ryan that their search of the sedan was not justified merely by his arrest. Cunningham alleges that he had been taken to the rear of the sedan prior to either his arrest or the search of the vehicle, so reading the facts in the light

most favorable to him, it would appear that he was neither unsecured nor within reach of the sedan's passenger compartment at the time of the search. It also would be clear that additional evidence of the crime of his arrest—operating a vehicle with its registration plate affixed to the wrong location—was certainly neither necessary nor likely to be found in the sedan. In short, Hackett and Ryan would not be entitled to qualified immunity for searching the sedan incident to Cunningham's arrest if the search had occurred after *Gant* was decided.

Qualified immunity, however, is concerned not with the state of the law as it currently exists, but in the state of clearly established law "at the time of the alleged violation." *See Conn v. Gabbert* 526 U.S. 286, 290 (1999). And at the time of Cunningham's arrest, *Belton* and its categorical rule were controlling. As Cunningham describes events, the search of the sedan occurred contemporaneously with his arrest. Under *Belton* and its progeny, such a search was permissible, even though Cunningham might already have been handcuffed and outside of reaching distance of the sedan's passenger compartment at the time. *See Belton*, 453 U.S. at 460; *Brothers*, 438 F.3d at 1073 (citations omitted).

I do not relish concluding that Hackett and Ryan are entitled to qualified immunity based on an argument they failed to raise and pursuant to outdated law. It is frankly baffling to me that defense counsel, whom I would expect to be familiar with the law governing motions for summary judgment, would inexplicably fail to target such a motion to Cunningham's version of the facts relating to the vehicle search. Nonetheless, it is apparent from Cunningham's own recitation of facts that the sedan was lawfully searched as an incident to an arrest based on the clearly established law at the time, and Cunningham has failed to otherwise show a violation of a clearly established Fourth Amendment right given these facts. Therefore, I recommend that the

Court grant summary judgment to Hackett and Ryan on Cunningham's illegal search and seizure claims on the basis of qualified immunity.

## II.     Malicious Prosecution and False Imprisonment

Similarly, Cunningham argues that Hackett and Ryan falsely imprisoned him and instigated a malicious prosecution against him. In the Tenth Circuit, both claims ultimately turn on whether a defendant has violated the Fourth Amendment's proscription against unreasonable seizures. *See Wallace v. Kato*, 549 U.S. 384, 389 (2007) (asserting that the constitutional tort of false arrest/false imprisonment arises from unlawful "detention without legal process"); *Taylor v. Meacham*, 82 F.3d 1556, 1560-62 (10th Cir. 1996) (noting that when a malicious prosecution claim is brought under § 1983, the "ultimate question" is whether the plaintiff has shown that a Fourth Amendment violation occurred); *see also Romero v. Fay*, 45 F.3d 1472, 1480 (10th Cir. 1995) (stating that a false imprisonment claim is established under § 1983 when "a government official acted with deliberate or reckless intent to falsely imprison the plaintiff."). Cunningham presents no evidence of deliberate or reckless intent on the officers' part other than his own self-serving statements, and I have already concluded that Cunningham's arrest was justified by probable cause. As such, Cunningham has failed to show a violation of a clearly established Fourth Amendment right, and Hackett and Ryan are therefore entitled to qualified immunity as to this claim.

## III.     Racial Profiling

Next, Cunningham contends that his traffic stop and arrest were the product of racial profiling. Selective enforcement of the law based on racial considerations is prohibited under the Equal Protection clause of the Fourteenth Amendment. *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1263 (10th Cir. 2006). Such a

claim may stand even if a claim under the Fourth Amendment does not. *See Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1166 (10th Cir. 2003). "To withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect." *Id.* at 1168. The discriminatory purpose must be a motivating factor in the decision to seize the plaintiff, even if it is not the only underlying purpose. *Id.* (citations omitted). This standard is a "demanding" one. *See Alcaraz-Arellano*, 441 F.3d at 1264 (citation omitted).

In *Marshall*, the Tenth Circuit concluded that in light of the disputed evidence in the record, the district court had erroneously granted summary judgment in the defendants' favor on a racial profiling claim. *See Marshall*, 345 F.3d at 1170. Although the plaintiff's testimony that he had not committed any traffic violations before being pulled over "was not sufficient to establish lack of probable cause" for his stop and arrest, the court held that the testimony "would be evidence that the officer's initial decision to pull [the plaintiff] over was pretextual." *Id.* at 1169. The plaintiff's testimony also included unrebutted allegations that the officer attempted to ascertain the plaintiff's race before pulling him over, accused him of using crack at the beginning of the traffic stop for no apparent reason, included a racial designation on a citation form where none was called for, and dramatically changed his account of events over time. *See id.* at 1169-70. Even then, however, the Tenth Circuit described that evidence alone as only creating "a close question whether this is sufficient" for the claim to survive summary judgment; the issue was ultimately resolved on additional evidence. *See id.* at 1170.

Here, Cunningham has not provided evidence that approaches even the "close question" presented in *Marshall*. Although Cunningham, like the plaintiff in *Marshall*, insists that he "was not doing anything wrong" on the night in question, even his own version of events demonstrates that the sedan's registration plate was arguably placed in violation of a state statute. Cunningham also gives no indication that Hackett or Ryan acknowledged his race in any inappropriate way, and the record demonstrates no inconsistencies in the officers' description of events since the arrest. Cunningham does claim that he submitted in his state criminal case a study showing that racially motivated traffic stops were being conducted in the city of Albuquerque, and statistical studies may be used to show both discriminatory purpose and discriminatory effect. *See Marshall*, 345 F.3d at 1168. However, Cunningham has not submitted that study as evidence in this case, and he does not even describe how this study purports to show that Hackett and Ryan acted with discriminatory purpose in his particular case. *See Blackwell v. Strain*, 496 F. App'x 836, 840-43 (10th Cir. 2012) (unpublished) (citing, *e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 293 & n.12 (1987)) (concluding that even where an officer was shown to have arrested a high percentage of African Americans, plaintiff had nonetheless failed to show discriminatory purpose in the absence of additional demographic information and specific evidence regarding the particular stop in question).

In the absence of this and other such evidence of discriminatory purpose, Cunningham has not shown that Hackett and Ryan violated his clearly established Equal Protection rights. I therefore recommend that summary judgment as to this claim be granted in the officers' favor on the basis of qualified immunity.

IV.     § 1983 Conspiracy

Cunningham alleges that Hackett and Ryan "went across the street [from his hotel room] and conspired with one another to conduct [an] illegal stop." To succeed on a § 1983 conspiracy claim, a plaintiff "must prove both the existence of a conspiracy and the deprivation of a constitutional right." *Maynard v. Fallin*, --- F. App'x ---, 2014 WL 1677982, at *6 (10th Cir. Apr. 29, 2014) (unpublished) (quoting *Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995)). Here, Cunningham has failed to show that Hackett and Ryan violated any clearly established constitutional right, and thus the officers are similarly entitled to qualified immunity for any conspiracy claim under § 1983 tied to other alleged violations. *See id.*; *Thompson*, 58 F.3d at 1517.[7]

V.      **Municipal Liability**

Cunningham also brings the aforementioned claims against the City under 42 U.S.C. § 1983. However, "[a] municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Instead, a plaintiff seeking to establish municipal liability must show "1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

A municipality may be found liable for the actions of its officers if these two elements are satisfied, regardless of whether the officers themselves are found to be entitled to qualified immunity, provided that the finding of qualified immunity is not predicated solely on the basis that the law was not clearly established at the time of the alleged violations. *See id.* (citations

---

[7] To the extent that Cunningham's conspiracy theory turns on an alleged conspiracy to deprive him of the equal protection of law, *see* 42 U.S.C. § 1985(3), that claim must also fail for the same reasons.

omitted). That said, "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Id.* (citing, *e.g.*, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

In this case, I have found that Hackett and Ryan committed no constitutional violation during the traffic stop and Cunningham's arrest. Moreover, the search of the sedan Cunningham was driving was seen as constitutionally permissible at the time and was objectively reasonable when it was conducted. *Cf. United States v. McCane*, 573 F.3d 1037, 141-45 (10th Cir. 2009) (applying the good-faith exception to deny suppression where officers' pre-*Gant* search was consistent with pre-*Gant* circuit caselaw). Accordingly, the City may not be held liable for any of the above-mentioned claims, and summary judgment in its favor is appropriate. *See id.* at 782-83 (citing, *e.g.*, *Siegert* , 500 U.S. 226, 232-33 (1991)).

## VI.    State Law Claims[8]

Cunningham's remaining claims of malicious abuse of process and conspiracy arise under the New Mexico Tort Claims Act, which provides the sole means for bringing a tort claim against governmental entities and their employees for their actions while working within their scope of duty. *See* N.M. Stat. Ann. § 41-4-1 *et seq*. The Act provides such actors with immunity from tort claims unless that immunity is specifically waived. N.M. Stat. Ann. § 41-4-4(A). Relevantly, the Act waives immunity for actions against law enforcement officers for a

---

[8] Cunningham appears to invoke jurisdiction for his state law claims pursuant to 28 U.S.C. § 1367(a). If the Court were to adopt my recommendation that summary judgment be granted in Defendants' favor as to all federal claims, the Court could also exercise its discretion to decline jurisdiction over the remaining state law claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."). However, given that Defendants have not requested this relief, and given the possibility that Cunningham's claims might be time-barred if brought anew in state court (*cf.* Doc. 31 at 23-25), I will limit my consideration of these claims to the substantive arguments Defendants have raised in their *Martinez* report.

variety of torts listed in N.M. STAT. ANN. § 41-4-12. Because the Act limits the common-law right of citizens to sue their government, it must be strictly construed. *Cal. First Bank v. State*, 801 P.2d 646, 650 (N.M. 1990) (citation omitted).

A.  <u>Malicious Abuse of Process</u>

Defendants somewhat confusedly assert, without citation to authority, that New Mexico has not waived immunity for Cunningham's malicious abuse of process claim since probable cause existed to arrest him. This is plainly incorrect, as the New Mexico Tort Claims Act specifically waives the immunity of law enforcement officers as to malicious abuse of process claims. *See* N.M. STAT. ANN. § 44-14-12 (waiving immunity for malicious prosecution and abuse of process); *see also Durham v. Guest*, 204 P.3d 19, 25-26 (N.M. 2009) (noting that claims of malicious prosecution and abuse of process have been restated as a single "malicious abuse of process" claim in New Mexico). However, because Cunningham brings this claim by asserting a lack of probable cause when Defendants initiated his prosecution, and because Defendants go on to assert that "lack [of] probable cause is an essential element" of a malicious abuse of process claim, I read their motion as attacking Cunningham's claim on the substance.

A plaintiff may succeed in a malicious abuse of process claim by showing the following elements: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham*, 204 P.3d at 26. The first element, an improper use of process, may be satisfied by "(1) filing a complaint without probable cause, or (2) 'an irregularity or impropriety suggesting extortion, delay, or harassment[,]' or other conduct formerly actionable under the tort of abuse of process." *Id.* (citing *Fleetwood Retail Corp. of N.M. v. LeDoux*, 164 P.3d 31, 35 (N.M. 2007)). And a use of process is irregular or improper if it

"(1) involves a procedural irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, or (2) indicates the wrongful use of proceedings, such as an extortion attempt." *Id.* (citing *DeVaney v. Thriftway Mktg. Corp.*, 953 P.2d 277, 287 (N.M. 1997)).

Here, even viewing the facts in the light most favorable to Cunningham, his malicious abuse of prosecution claim must fail. First, the criminal complaint filed against Cunningham charged him with trafficking of a controlled substance and tampering with evidence.[9] (Doc. 43 Ex. D.) The former offense is defined as, among other things, "possession with intent to distribute" a controlled substance. N.M. STAT. ANN. § 30-31-20. The latter offense is defined as, *inter alia*, "hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person." N.M. STAT. ANN. § 30-22-5. Having procured the bag of crack cocaine from the sedan Cunningham was driving via a valid search incident to an arrest, and having previously observed Cunningham moving furtively in the sedan, a reasonable officer would believe that probable cause existed as to these two offenses. Thus, the complaint was not filed without probable cause. Second, Cunningham provides no evidence of any procedural irregularity or misuse of procedural devices in initiating his prosecution, and nothing in the record indicates an extortion attempt or other wrongful use of proceedings.

Because the record does not show that criminal charges were filed against Cunningham without probable cause or that his prosecution was otherwise initiated by Hackett and Ryan through an irregular or improper use of process, there is no genuine dispute of material fact that Cunningham has failed to satisfy the first element of a malicious abuse of process claim. Defendants are therefore entitled to summary judgment on this claim.

---

[9] The latter charge was later dropped.

B.  Conspiracy

Cunningham's conspiracy claim under New Mexico law can succeed only if he can demonstrate "(1) that a conspiracy between two or more individuals existed; (2) that specific wrongful acts were carried out by the defendants pursuant to the conspiracy; and (3) that the plaintiff was damaged as a result of such acts." *Ettenson v. Burke*, 17 P.3d 440, 445 (N.M. Ct. App. 2000) (citation omitted). More generally, civil conspiracy is defined "as achieving an unlawful purpose or using an unlawful means to achieve a lawful goal." *Id.* Civil conspiracy does not provide an independent basis for liability, as it depends on the existence of a valid civil claim for damages against one or more conspirators. *Id.* (citations omitted).

Cunningham claims that Hackett and Ryan entered into a conspiracy to conduct an illegal stop. Defendants argue that the existence of reasonable suspicion and probable cause at the time of their traffic stop is fatal to Cunningham's claim. Defendants have the better of the argument, as reasonable suspicion existed to justify the traffic stop even under Cunningham's own recitation of the facts. As such, not only has Cunningham failed to show that "specific wrongful acts were carried out by the defendants," he has also failed to show that "a civil action in damages would lie against one of the conspirators." *Id.* (citations omitted). As no genuine dispute of material fact exists to support a civil conspiracy claim against Defendants, I recommend that the Court grant summary judgment in their favor as to this claim.

CONCLUSION

For the foregoing reasons, I recommend that the Court grant summary judgment in favor of Defendants. To the extent that Cunningham's response (Doc. 45) is intended to serve as a motion for summary judgment in his favor, I recommend that the Court deny that motion.

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

_William P. Lynch_
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.